Janet COCHRAN, Plaintiff,

v.

SENIORS ONLY FINANCIAL, INC., and Mark Gremler, Defendants.

No. CIV.4–01–CV–10145.

United States District Court, S.D. Iowa, Central Division.

June 18, 2002.

Charles E. Gribble, Matthew M. Boles, Parrish, Krruidenier, Moss, Dunn & Mont-gomery, LLP, Des Moines, IA, for Plaintiff.

Brent R. Appel, Rebecca Boys Dublinske, Dickinson, Mackaman, Tyler & Hagen, PC, Des Moines, IA, for Defendants.

## ORDER

LONGSTAFF, Chief Judge.

Before the Court are two motions for partial summary judgment by defendants. Defendants' first motion was filed on February 15, 2002. Plaintiff filed a resistance on March 13, and defendants replied on March 28. Defendants' second motion for partial summary judgment was filed on April 15, 2002, and plaintiff resisted on May 6, 2002.

In her second amended complaint, plaintiff alleges: violation of the Fair Labor Standards Act, 29 U.S.C. section 207(a)(1) (Count I); violation of the Iowa Wage Payment Collection Law, Iowa Code section 91A.8 (Count II); breach of contract (Count III); hostile work environment sexual harassment in violation of Iowa Code Chapter 216 (Count IV); sex discrimination in violation of Iowa Code section 216.6 (Count V); and breach of contract based upon the governing employment policy manual's policies (Count VI). In their first motion for summary judgment, defendants seek a favorable ruling on Counts IV and V asserting that they did not have enough employees to be subject to Iowa Code Chapter 216. In their second motion, they seek summary judgment with respect to Count VI, and argue a contract was not created by the employee policy manual. Oral argument has been requested but deemed unnecessary. The matters are fully submitted.

## I. BACKGROUND

The following facts are viewed in a light most favorable to plaintiff as the non-mov-

ing party. Defendant's motions for partial summary judgment present narrow questions. Therefore, the Court will recount only the factual allegations made by plaintiff relevant to these issues.

Mark Gremler, defendant, operates his own business[1] and sells insurance and securities products. Janet Cochran, plaintiff, began her employment with Gremler on September 1, 1998 as his assistant. Her duties included scheduling appointments, opening mail, answering the phone, tracking commissions, handling payroll, and other clerical duties. At the time she began working for Gremler, she was his only employee.

More than a year after she began employment with Gremler, he began to hire additional employees. From September 1999 to November 1999, Nicole Tierman worked for Gremler as an assistant. Kimberly Holtz, also known as Kimberly Kingsly, worked full-time for him from November 1999 until October 2000.[2] Carolyn Peterson worked for him on a part-time basis, four hours per day, from July 17, 2000 through October 30, 2000. Rebecca Lacy began to work full-time for Gremler on August 21, 2000.[3]

Plaintiff, Janet Cochran, was terminated by Gremler on September 1, 2000. At the time, Gremler told Cochran he was firing her because she didn't seem to enjoy her job. Gremler now gives several performance based reasons to explain his decision to fire her. After Cochran's termination, Rebecca Lacy assumed her duties

While Cochran was still employed, Gremler began a relationship with G. David Peterson in late May 2000. Peterson is licensed with the state of Iowa and individual companies to sell insurance and financial products. Peterson is an employee of Prudential Financial. Gremler paid for the printing of a business card for Peterson. It states that he is a representative of "Seniors Only Financial," and is a "Field Agent for Mark R. Gremler." The business card also lists the address and phone numbers of Mark Gremler's office, and lists Peterson's email address as "markgremler@webslnger.com." Gremler would give Peterson the names of clients or potential clients, and then split the commission with him.[4] Gremler's employees would set up some appointments for Peterson, and he met with some clients at Gremler's office and was there on a regular basis. Gremler has also loaned Peterson the cost of taking a correspondence course. Gremler does not pay Peterson a salary, wages, or benefits; nor does Gremler issue a W–2 form to him. Peterson continues to sell insurance and securities unrelated to the business relationship he has with Gremler.

As a part of his business, Gremler maintains an office policy manual. The record indicates that Cochran received such a manual upon commencing her employment on September 1, 1998. It also indicates

1. It appears Gremler is affiliated with a large entity known as Vision Financial Group. Additionally, in 1999, Gremler formed an Iowa corporation entitled Seniors Only Financial, Inc., also a named defendant in this action. Both of these entities appear to help Gremler market his financial services agency, and he operated his business under one or both names during the relevant time.

2. Devon Bell began employment with Gremler in November 2000 after Holtz resigned.

3. Gremler's wife, Beth Gremler, is not an employee of her husband. She is an officer of Seniors Only Financial, Inc.

4. Generally, the commission is split between Gremler and Peterson by the insurance or other company whose product was sold. However, on two occasions, the company has paid Gremler the full amount of a sale in which Peterson was involved. In those cases, Gremler then paid Peterson out of a personal checking account he maintains with his wife.

that she received a second policy manual at a later time, but does not indicate when she received the second manual and whether it was identical to the first manual. The manual now in the record is six pages and addresses employee benefits, expectations, pay, performance and salary reviews, along with termination. The manual has a section entitled "Involuntary Termination," stating only that "[a]n employee may be discharged for cause." *See* Defendants' Appendix to Their Second Motion for Partial Summary Judgment at 6.

## II. APPLICABLE LAW & DISCUSSION

### A. Summary Judgment

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material

.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### B. Counts IV and V

■ In these causes of action, plaintiff alleges defendants created a hostile work environment and discriminated against her on the basis of her sex in violation of Iowa law. *See* IOWA CODE CH. 216.

The Iowa Civil Rights Act ["ICRA"], chapter 216 of the Iowa Code, prohibits various forms of discrimination in employment. It was passed in 1965 in an effort to establish parity in the workplace and market opportunity for all. The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa Courts therefore traditionally turn to federal law for guidance in evaluating the ICRA.

*Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citing *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983)). However, the court in *Vivian* made clear that federal law is not controlling of ICRA claims, but rather that Title VII and case law interpreting it provides "the analytical framework" for claims under the ICRA. *Id.* (Iowa Supreme Court in *Vivian* held that supervisors were subject to individual liability under the ICRA, despite the fact that is not the case under Title VII).

■ Under the ICRA, an employee is "any person employed by an employer," and employer includes any "person employing employees within the state." IOWA CODE § 216.2(6) and (7).[5] Certain employers are exempted from the reach of the ICRA, including "[a]ny employer who regularly employs less than four individuals." IOWA CODE § 216.6(6)(a). The issue in this case is whether defendants employed "less

---

5. "Person" is defined in part as "one or more individuals, partnerships, associations, [or] corporations." IOWA CODE § 216.2(11). Both

defendants in this case qualify as a person under this definition, and both are capable of being employers under this law.

than four individuals" as a matter of law and are therefore exempt from the application of the Iowa Civil Rights Act because this numerosity requirement is not met.

█ Iowa Code section 216.6(6)(a) has not been heavily inspected by the courts. This Court cannot find a decision interpreting what makes a person "regularly" employed for purposes of determining if they are an employee under the ICRA, and as the Iowa Supreme Court stated, "[t]here is surprisingly little to discover with regard to the legislative history of the Iowa Civil Rights Act." *Vivian,* 601 N.W.2d at 874. In *Vivian,* the Iowa Supreme Court found some stark differences in the language the Iowa legislators choose to use, and found that federal law was not persuasive and a supervisor could be held personally liable under the ICRA. In this case, the Court does not find these same differences in the relevant statutory language when comparing the ICRA to Title VII. While the ICRA states that for an employee to count he or she must be "regularly" employed, Title VII goes a step farther and says that an employee must be employed "for each working day in each of 20 or more calendar weeks in the current or preceding calendar year" in order for the employee to count towards the numerosity requirement. 42 U.S.C. § 2000e(b). The Court finds that Title VII does provide appropriate guidance for determining whether an employee is "regularly" employed under the ICRA and adopts this definition.

The record in this case show that plaintiff herself and Kimberly Holtz, also known as Kimberly Kingsly, were regularly employed under the definition noted above. Rebecca Lacey began work for Gremler on August 21, 2000, and therefore during the calendar year 2000 she was employed for nineteen weeks plus one day. As this Court finds she must have been employed for twenty weeks in order to.

have been "regularly" employed, Lacey does not count toward the numerosity requirement. Nicole Tierman was not employed for a twenty week period in the preceding calendar year, 1999, and neither Carolyn Peterson nor Devon Bell was employed for a twenty week period in 2000; thus, none of these individuals were "regularly" employed by Gremler in a relevant calendar year.

As the Court finds defendants regularly employed only two employees during the relevant time frame, it determines that a significant analysis into whether G. David Peterson was an "employee" is not required. Even if Peterson was an employee, defendants would be exempt from the application of the ICRA in this context as they maintained less than four employees. Defendants' motion for summary judgment on Counts IV and V will be granted.

### C. Count VI

█ Defendants assert that while they maintained an employee handbook, nothing in the handbook altered the employment-at-will nature of the relationship they had with plaintiff. An employee handbook can create a unilateral contract such that an employee can only be discharged under certain conditions or for "just cause." *French v. Foods, Inc.,* 495 N.W.2d 768, 770 (Iowa 1993). For such a contract to be created, the standard matters of offer, acceptance and consideration must be met: the manual must be sufficiently definite to create an offer, it must be given to an employee such that an acceptance is created, and the employee worked thereby providing consideration. *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989). The party arguing an employee handbook creates a unilateral contract carries the burden of proving its existence, and "except in the case of ambiguity, whether an employee handbook binds the parties in contract is a

question of law." *Thompson v. City of Des Moines,* 564 N.W.2d 839, 844 (Iowa 1997) (quoting *Fogel,* 446 N.W.2d at 456).

■ Defendants' manual has a section entitled "Involuntary Termination," and it states only that "[a]n employee may be discharged for cause." *See* Defendant's Appendix to Their Second Motion for Partial Summary Judgment at 6. Despite what plaintiff alleges, *see* Plaintiff's Statement of Facts (filed May 6, 2002) at ¶ 4, defendants' manual does not state that plaintiff may be terminated *only* for cause. The Court finds that the statement that an employee may be terminated for cause leaves open the possibility that the employee may also be terminated without cause, and thus the employment-at-will doctrine is not restricted. Defendants' manual simply does not guarantee that an employee will be discharged only for cause. *See, e.g., Vick v. Heatilator, Inc.,* 537 N.W.2d 810, 812 (finding an employee handbook's terms were not definite enough to create a unilateral contract; the handbook clearly stated it did not constitute a contract and the listing of specific reasons an employee *could* be terminated did not limit the employer to terminating an employee *only* for those reasons as the handbook did not limit the employer in such a way). As a matter of law, a definite offer to create a unilateral contract under Iowa law was not created by the employment manual in this case. Defendants' motion will be granted.

## III. CONCLUSION

For the aforementioned reasons, defendants partial motions for summary judgment with respect to Counts IV, V and VI are granted.

IT IS SO ORDERED.